AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means



LODGED
CLERK, U.S. DISTRICT COURT

05/06/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

# UNITED STATES DISTRICT COURT

### for the

### Central District of California



FILED
CLERK, U.S. DISTRICT COURT

5/7/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

| In the Matter of the Search of | ) | |
|---|---|---|
| 11300 Bean Street, Beaumont, California 92223, as further described in Attachment A-2 | ) ) ) | Case No. 5:24-mj-00209 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Threats by Interstate Communication |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*/s/ Andrew Bland*
*Applicant's signature*

Andrew Bland, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: May 7, 2024

_____
*Judge's signature*

City and state: Riverside, CA

Honorable Sheri Pym , United States Magistrate Judge
*Printed name and title*

AUSA: Kenneth R. Carbajal,

x3172

**ATTACHMENT A-2**

PREMISES TO BE SEARCHED

The premises to be searched is located at 11300 Bean Street, Beaumont, California 92223 (the "SUBJECT PREMISES"). The SUBJECT PREMISES, as depicted in the photographs below, is a single-family residential home with an attached garage with a beige exterior and bears the number 11300 to the left of the garage.

The area to be searched at the SUBJECT PREMISES includes all rooms, annexes, attics, basements, porches, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers, locked containers and safes, cabinets, rooms, parked vehicles, motorhomes, sheds, and outbuildings associated with the SUBJECT PREMISES, and shall extend into desks, cabinets, safes, briefcases, backpacks, wallets, purses, trash receptacles, digital devices, and any other storage locations within the SUBJECT PREMISES.

 

## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of a violations of Title 18, United States Code, Sections 875(c) (Threat by Interstate Communication), 844(e) (Threat by Interstate Commerce to Kill, Injure, or Intimidate Another Person), and 2261A(2)(b) and 2261(b)(5) (Stalking) (the "Subject Offenses"), namely:

    a.   Firearms or ammunition;

    b.   Records, documents, programs, applications, materials, or information relating to threats of violence against others online, including planning or searching for information relating to the same;

    c.   Records, documents, programs, applications or materials showing knowledge and/or familiarity with any of the Victims listed within the affidavit.

    d.   Messages, communications, audio recordings, pictures, video recordings, or still captured images relating to threats to commit targeted violence or other physical violence against individuals or groups;

    e.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the Subject Offenses;

    f.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the Subject Offenses;

g.  Records, documents, programs, applications, materials, or information relating to posts on Youtube and X Corp;

h.  Information relating to any co-conspirators engaged in the Subject Offenses, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication; and

i.  Records, documents, programs, applications, or materials of the state of mind of COLLINS and any co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the Subject Offenses.

2.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

6.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

6

e.    If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

7

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.     During the execution of this search warrant, law enforcement is permitted to: (1) depress COLLINS's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of COLLINS's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Andrew Bland, being duly sworn, declare and state as follows:

**I.    PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrant against CHASE COLLINS ("COLLINS") for a violation of Title 18, United States Code, Section 875(c): Threats by Interstate Communication.

2.   This affidavit is also made in support of an application for a warrant to search: (1) the person of COLLINS, as described more fully in Attachment A-1; and (2) 11300 Bean Street, Beaumont, California 92223 (the "SUBJECT PREMISES"), as described more fully in Attachment A-2. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 875(c) (Threat by Interstate Communication), 844(e) (Threat by Interstate Commerce to Kill, Injure, or Intimidate Another Person), and 2261A(2)(b) and 2261(b)(5) (Stalking) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth

1

all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and part only.

## II.  BACKGROUND OF AFFIANT

4.   I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI") and have been so employed since April
2021.  Prior to being employed with the FBI, I was employed by
the Texas Department of Public Safety as a State Trooper from
September 2016 through March 2021.  My current assignment with
the FBI is in the Los Angeles Field Office, Riverside Resident
Agency, assigned to the Joint Terrorism Task Force, where I
investigate, among other things, people who commit violent
criminal acts in furtherance of their political or social
ideology, and investigate threats associated with the use of
firearms, chemical, biological, radiological, nuclear, and
explosive materials.  As a Special Agent, I have received both
formal and informal training from the FBI regarding domestic and
foreign terrorism investigations.  Through my training and
experience, I am familiar with the methods of operation that
individuals associated with domestic and foreign terrorist
organizations employ--including Facebook, Instagram, Telegram,
Google, and YouTube--to communicate with associates regarding
their ideology, to organize actions on behalf of their
organizations, and to bring attention to their political and
social agendas.  As an FBI Special Agent, I have also
participated in the execution of multiple arrest and search

2

warrants, including search warrants executed at physical residences in cases involving domestic terrorism and threats.

### III.  SUMMARY OF PROBABLE CAUSE

5.   The FBI has identified COLLINS, who resides in the City of Beaumont within the Central District of California, as an individual who has been transmitting threats and violent statements via social media, electronic devices, and his cellular phone. Specifically, COLLINS threatened to kill or cause serious bodily injury to his victims on social media platforms, via email, and through telephone calls. At a date beginning no later than September 29, 2022, and continuing to the present, COLLINS has stalked and made direct threats to three individuals who reside in the state of Indiana. All of these threats have occurred while COLLINS has been located in the Central District of California and the victims have been located in Indiana.

### IV.  STATEMENT OF PROBABLE CAUSE

6.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   COLLINS'S BACKGROUND

7.   According to California Department of Motor Vehicles ("DMV") records, as of November 17, 2021, COLLINS's address of record is the SUBJECT PREMISES. COLLINS is registered with

3

California Driver's License Number ending in 347 under his name "COLLINS CHASE ANTHONY."

8.    On January 17, 2024, I interviewed COLLINS at the SUBJECT PREMISES. Based on the interview, I am familiar with COLLINS's physical appearance and the sound of his voice.

9.    On March 21, 2024, SA Enrique Armenta observed an individual that matched the description of COLLINS exit and then re-enter the SUBJECT PREMISES.

10.   According to records provided by Verizon, a phone number ending in 3273 ("the 3273 Number") is subscribed to Lori Caruthers Collins and the registered address with Verizon is the SUBJECT PREMISES. Based on an interview with SA Erin Norwood, Lori Caruthers Collins is COLLINS's mother.

11.   Further, according to Verizon Wireless records, the 3273 number has an Apple device assigned to it, which is an iPhone 11.  The International Mobile Equipment Identity ("IMEI") for the iPhone 11 and the 3273 Number is an IMEI ending in 6118.

**B.   COLLINS MADE THREATS TO VICTIM 1 IN FALL 2022**

12.   According to victim A.B. ("VICTIM 1"), between July 2022 and September 2022, COLLINS harassed and threatened VICTIM 1 via telephone. On October 14, 2022, SA George Paz interviewed VICTIM 1, who stated she had met COLLINS in college at Purdue University.

13.   In her interview with the FBI, VICTIM 1 explained that she had been receiving phone calls from a blocked number. In one of the phone calls, the caller of the blocked number asked, "Is

4

this [VICTIM 1]?" VICTIM 1 reviewed her cell phone provider's records and found the blocked phone calls originated from the 3273 Number. VICTIM 1 then cross-referenced the phone number with the phone application, CashApp[1]. VICTIM 1 discovered that the 3273 Number was assigned to the username, "$Chasemoney23$" and had a profile picture of COLLINS. On July 21, 2022, VICTIM 1 texted the 3273 Number, confirmed she was texting with COLLINS, and asked why he had been texting her.

14.   On September 27, 2022, COLLINS placed a phone call to VICTIM 1 and stated that VICTIM 1 was going to die and COLLINS would travel to Tippecanoe County (Indiana) to conduct the killings. Detective Austin Burris of the Tippecanoe County Sheriff's Office reported this threat to the FBI on September 29, 2022. According to the Tippecanoe County Sheriff's Office, on September 27, 2022, VICTIM 1 received a voicemail from the 3273 Number. VICTIM 1 was scared for her life following the phone call. I have reviewed the voicemail and I believe the caller's voice to be COLLINS's voice. On the voicemail, COLLINS states:

> *Hey, [VICTIM 1]. Um. I'm not doing whatever email you or whatever. I just wanted to call you and let you know that my name is Chase Collins. I was born [month, date], 1987[2]. I know that you — [VICTIM 1]… and most definitely your dad are some fucking Klu Klux Klan members, okay? And uh. I just want you to know that*

---

[1] CashApp is a mobile payment service in the United States that allows users to transfer money to another.

[2] Based on DMV records, COLLINS's registered date of birth matches the month, date, and year he stated in this voicemail.

*you're about to die, okay? So, I'll repeat that again.*
*Your name, my na. Excuse me, my name is Chase Collins.*
*You know exactly who the fuck I am, and you're about*
*to die, okay? And yeah, I'm about to catch a Southwest*
*flight, go to Indianapolis, rent a car, drive up to*
*fuckin' Tippe-tippecanoe County and start killing some*
*people, alright? Especially like Marty, and-and I just*
*wanted to let you know that, alright? And uh. Yeah,*
*feel free to call me back and I'll ask you what your*
*rank was in the Klu Klux Klan and you ain't say shit,*
*alright, 'cause I know you're a fuckin' Klu Klux Klan*
*member, alright? Now feel free to give me a call back,*
*[xxx-xxx-]3273[3].*

15.   In January 2024, in an interview with the FBI, COLLINS admitted to contacting VICTIM 1 by her telephone number.

## C.   COLLINS BEGAN MAKING THREATS TO VICTIMS 2 AND 3 IN FALL OF 2022

16.   According to victim S.P. ("VICTIM 2"), beginning in August 2022 through April 2024, COLLINS has harassed and threatened VICTIM 2 through social media and electronic devices. Based on an interview with FBI Task Force Officer ("TFO") Travis Neal, VICTIM 2 met COLLINS approximately 15 years prior to being threatened. VICTIM 2 remembered seeing COLLINS multiple times at local bars.

17.   Based on a report from the West Lafayette (Indiana) Police Department, on August 8, 2022, COLLINS called VICTIM 2 multiple times at her place of work. On the same day, COLLINS also called VICTIM 2's co-workers at their place of work in order to get VICTIM 2 on the phone with him. The West Lafayette

---

[3] The ten-digit number mentioned in this call by COLLINS matches the 3273 Number.

6

Police Department then advised COLLINS to cease contacting VICTIM 2.

18. According to victim L.E. ("VICTIM 3"), VICTIM 3's first interaction with COLLINS was in August 2022. VICTIM 3 is a law enforcement officer in Indiana. VICTIM 3 was the assigned officer to investigate the initial calls from COLLINS to VICTIM 2 in August 2022. VICTIM 3 advised COLLINS to stop making phone calls to VICTIM 2 or COLLINS might face criminal action.

19. Based on a report from the West Lafayette Police Department, on September 26, 2022, COLLINS was still placing calls to VICTIM 2's place of work. COLLINS would call VICTIM 2's place of work to speak to VICTIM 2. On September 28, 2022, VICTIM 3 called COLLINS on the 3273 Number to advise COLLINS to stop making phone calls to VICTIM 2. VICTIM 3 recorded this phone call. I have reviewed the phone call and recognize COLLINS's voice.

20. On February 5, 2024, and February 6, 2024, COLLINS used the 3273 Number to call VICTIM 2's place of work and stated he was going to visit Indiana in the upcoming weeks. COLLINS contacted the place of work approximately four times on February 5, 2024, and six times on February 6, 2024. COLLINS stated that he wished to make an appointment with VICTIM 2 at her place of work.

21. On March 20, 2024, VICTIM 2 provided the FBI with an email that their place of work received from the email address, champb2424@gmail.com. I have reviewed the email and noted that the email states it is from "Chase Collins."

7

a.   An excerpt from the email received by VICTIM 2's place of work on March 20, 2024, included:

> *Before you think about your next move* [VICTIM 2]*, I want you to think very carefully. I have already mentioned multiple times to forward this to whoever you want, especially in law enforcement. I still have the same number I had in 2022 so you can reach out to me or respond to this email. Because I know that I have proved to you by now that I am serious as an OWI on US Hwy 52 west. You racist, Ku Klux Klan white trash bitch. You are my Indiana cum slut whore. We are going to talk one way or another. It's all up to you. I will say this again. Please forward this to whoever you want. Fuck you, you racist piece of Ku Klux Klan, card holding, hood wearing, CERTIFIED Ku Klux Klan white trash SLUT! I could go on more but this is good enough.  I look forward to putting my dick in you soon.*

22.   In January 2024, in an interview with the FBI, COLLINS admitted to contacting VICTIM 2 and knew of her place of employment.

23.   On March 21, 2024, VICTIM 3 contacted the FBI about a threatening phone call that the West Lafayette Police Department dispatch received from the 3273 Number that same day. In the phone call, COLLINS identified himself, his X (Twitter) account (@ChasinTruth2022), and threatened to kill VICTIM 2 and VICTIM 3. VICTIM 3 advised SA Peter Langrish that VICTIM 2 was terrified for her life after learning of the March 21st phone call. I have listened to a recording of the phone call and believe the voice to be that of COLLINS.

a.   Specifically, COLLINS stated the following on the phone call:

> "*I'm about to get on a flight from Ontario, California to Indianapolis, Indiana. I'm going to catch the Lafayette Limo or Uber to West Lafayette and I'm going to kill [VICTIM 2] or whatever the fuck her name is, alright.*"

b.   COLLINS also stated:

> "*I'm going to the [VICTIM 2's PLACE OF WORK] and I'm going to murder [VICTIM 2] or [VICTIM 3]… I am going to come there and murder [VICTIM 2] in her fucking salon shop. Murder her. With my bare hands.*"

24.   On March 31, 2024, shortly after the phone call that occurred with West Lafayette Police Department, the X account that COLLINS mentioned in the March 21, 2024 phone call (@ChasinTruth2022), which I have reviewed, posted the following: "Y'all think I'm playin… time to get shit poppi. @fbi @WestLafayettePD remember that was me who called earlier… stay tuned."

25.   Based on my review of Riverside County Sheriff's Office ("RCSO") paperwork, I learned that on April 19, 2024, RCSO Deputy Russo served a protective order issued out of Tippecanoe Superior Court 5 (West Lafayette, Indiana) (the "protective order") to COLLINS at the SUBJECT PREMISES. The protective order names the victim as VICTIM 2 and COLLINS as the defendant.

26.   On April 22, 2024, after the service of the protective order to COLLINS, an email was sent to [VICTIM 2's PLACE OF WORK] from the email address, chasintruth2022@gmail.com. The email contained an attachment of a picture of an individual I recognized to be COLLINS. The email identifies COLLINS as the

9

sender in the signature line and directs the email to VICTIM 2.
An excerpt of the email states,

> *"Also, I know by contacting you again I am violating
> this protective order, which is why I am going to send
> it from another email address of mine (just in case
> you blocked my previous email). I want to make sure
> you receive this email."*

27.   On April 23, 2024, VICTIM 2 contacted the FBI and
advised that COLLINS had been repeatedly calling VICTIM 2's
place of work asking to speak to VICTIM 2 and VICTIM 3.
Screenshots of the caller ID history from VICTIM 2 displayed the
3273 Number as the origin of the calls that day.

28.   On April 23, 2024, the previously mentioned X account,
@ChasinTruth2022, posted the following:

> "[VICTIM 3], I swear on MY MOMMA, I am going to take
> your issued weapon, shoot you in the head, and fuck
> [VICTIM 2] AGAIN."

29.   On April 24, 2024, VICTIM 2 informed the FBI that a
YouTube Channel by the name of @chasinthetruth9181, posted a
live-streamed video. After review of videos on the YouTube
Channel @chasinthetruth9181, I recognize the individual in the
video to be COLLINS. In one of the videos, COLLINS references
VICTIM 2 and VICTIM 3 by stating that they will most likely be
on their way to getting shot. COLLINS then forms his hand to
resemble a pistol and places the hand to his head.

**D.  COLLINS' Was Located In The Central District Of California While Making The Threats To Victims 1, 2, and 3**

30.  Based on my review of Verizon records for the 3273 Number, on September 27, 2022, at 1:41 A.M. PST, the 3273 Number called the number of VICTIM 1. The Verizon records indicate that the 3273 number utilized the IP address of 72.96.17.224 at 1:19 A.M. PST. Based on my review of open-source information, the IP address 72.96.17.224 is associated with a physical location in El Segundo, California.

31.  On March 21, 2024, after the threats against VICTIM 2 and VICTIM 3, SA Armenta observed an individual that resembled COLLINS at the SUBJECT PREMISES.

32.  On March 21, 2024, members of the Beaumont Police Department met with COLLINS at the SUBJECT PREMISES.

33.  On the same date, I reviewed additional records provided by Verizon for the 3273 Number. Based on my review of those records, the 3273 Number held an approximate location of "33.931247, -116.909648,1282." Based on my review of open-source information, the coordinates "33.931247, -116.909648,1282" are in Banning, California.

34.  In the March 21, 2024, threat made by COLLINS to the West Lafayette Police Department, COLLINS stated that he would take a plane from Ontario, California to Indiana. Based on this information, I believe COLLINS communicated the threat while in Beaumont, California.

35.   Based on the above information, I believe COLLINS committed the interstate threats from within the area of the Central District of California.

## V.   TRAINING AND EXPERIENCE ON INTERSTATE THREATS CASES

36.   Based on my training and experience in interstate threats cases, persons that make threats similar to those described above often retain information relating to the threats on their person, in their home, and in their belongings. Specifically, due to the fixation on their victims, individuals may retain records, documents, programs, applications, or materials that relate to the preparation or planning of conducting threats and attacks against their victims. Based on my training and experience, individuals with a fixation on their victims may hold information relating to these victims in different forms. These forms include, but are not limited to digital devices, phone applications, social media applications, messaging platforms, hand-written notes, audio recordings, and video recordings.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

37.  Based on my training and experience in digital devices, persons that make threats similar to those described above often make efforts to obscure their identities and their communication accounts.  In this process, individuals may use multiple electronic devices to prevent their personal device from being easily discovered or to obfuscate their identity.  Additionally, individuals making threats similar to those described above need to access contact and other information for the individuals they are targeting.  In the digital era, it is common to search for this information using digital devices, including cellular telephones, tablets, and laptop or desktop computers.  Artifacts from these searches may exist on devices even if they were not directly used in the threat or hoax.

38.  Based on my training and experience and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

14

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300 KB) Word documents, or 614 photos with an average size of 1.5 MB.

15

40.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress COLLINS' thumb and/or fingers on the

16

device(s); and (2) hold the device(s) in front of COLLINS' face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

41.  Based on my training and experience, and conversations I have had with other law enforcement officers, I know that some individuals who participate in activities aimed at threatening or harassing victims via interstate communications have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications as well as applications that allow anonymous posts.  By using such applications, in some cases, the only way to see the content of these conversations or to link an individual to the post is on the electronic device that had been used.

42.  As described above, there is evidence that COLLINS had in his possession, a digital device while committing the Subject Offenses, because the communications were made on internet platforms.  Moreover, it is well-known that the use of digital devices is prevalent amongst adults in the United States.

43.  Based on my training and experience, I also know that individuals typically store their digital devices, such as cell phones, tablets, and laptop computers, on or near their persons, or where they reside, where they can be easily accessed and used or safely stored.  I also know that users of digital devices often access the internet using wireless routers (i.e., via a "wi-fi" connection) physically located where they spend time,

17

for example in their residence, and that such routers often retain data associated with users' internet activity.

44. In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss. Indeed, some companies provide services that seamlessly sync data across devices, such as Android devices and the Google cloud service. Thus, there is reason to believe that evidence even if originally created or saved on COLLINS's cellular phone may also be saved on or accessed by other digital devices used by COLLINS. In fact, based on my training and experience, it is common or individuals to have more than one digital device, including cellular phones, tablets, laptops, desktop computers, and external electronic storage devices, that they use to access the internet and download, post, and send content such as messages, images, and videos, including to and from social media accounts and email accounts, or to save similar content. Thus, based on my training and experience, as well as my participation in this investigation, evidence of the Subject Offenses is likely to be found on digital devices used by COLLINS, which are likely to be found in the SUBJECT PREMISES, his residence.

## VII. **CONCLUSION**

45. For all of the reasons described above, there is probable cause to believe that COLLINS has committed a violation of Title 18, United States Code, Section 875(c): Threat by

Interstate Communication.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person of COLLINS, as described in Attachment A-1, and in a search of the SUBJECT PREMISES, as described in Attachment A-2.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 7th day of May, 2024.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE